952 So.2d 564 (2007)
Tracy W. WILSON, Appellant,
v.
STATE of Florida, Appellee.
No. 5D06-931.
District Court of Appeal of Florida, Fifth District.
February 23, 2007.
Rehearing Denied March 29, 2007.
*566 Michael H. Hatfield of Hatfield & Baxley, P.A., Umatilla, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Kristen L. Davenport, Assistant Attorney General, Daytona Beach, for Appellee.
TORPY, J.
Appellant challenges the denial of his dispositive motion to suppress marijuana, paraphernalia and a firearm found during a warrantless search of his home and greenhouse. Concluding that sheriff's agents did not infringe upon Appellant's constitutional rights before Appellant voluntarily consented to the search of his residence and greenhouse, we affirm.
Appellant owns and lives on a 36-acre parcel of land in Lake County. A natural vegetative buffer makes it nearly impossible to see the interior of the property from its boundary lines, and a perimeter fence entirely surrounds the property except for a drive gate. The fence is primarily "rail" fencing, but one section of the fence is constructed of barbed wire. The drive gate, located near the front of the property, is usually kept closed. A "No Trespassing" sign is conspicuously displayed next to the gate.
Approximately 100 feet behind Appellant's residence is a greenhouse constructed of steel framing covered with semi-transparent plastic material. The greenhouse is only partially visible from the residence. There is no doorway in the greenhouse. Ingress and egress is accomplished *567 by lifting the plastic sides. The sides of the greenhouse are covered with nursery shade-cloth, which renders it difficult to see the interior of the greenhouse. Electrical power for the greenhouse is provided via an extension cord connected to Appellant's residence.
Approximately ten days before Appellant's arrest, one of his neighbors entered his property to look for the neighbor's dog. At that time, the neighbor observed the greenhouse, which the neighbor believed contained marijuana. The neighbor notified sheriff's agents who began a surveillance of Appellant's property over the course of several days.
Because sheriff's agents could not see the greenhouse from the boundary of the property, they surreptitiously entered the property by climbing over the fence and traversing the property up to the greenhouse. To view the contents of the greenhouse, it was necessary that the agents get very close to the greenhouse and touch its exterior. They wore camouflage suits to avoid detection. On the first occasion of their entry to the property, the agents observed more than 200 marijuana plants in the greenhouse, which they were able to view through a two-foot wide void in the covering on the greenhouse wall. After confirming that marijuana was growing in the greenhouse, the agents returned and entered the property on three more occasions over several days.
On the fourth occasion of their surveillance they were detected by Appellant's dog. As Appellant was walking in the area of the greenhouse, his dog alerted to the presence of one sheriff's agent who was crawling on the ground. When Appellant and his dog got close to the agent, the agent, Detective Padgett, rose to his feet, identified himself as a law enforcement officer, pointed a gun at Appellant, ordered Appellant to the ground and threatened to shoot Appellant's dog if Appellant did not control the dog. Padgett held Appellant at bay for several minutes until two other law enforcement officers arrived, at which time the agents instructed Appellant to get off the ground and keep his hands on his head. Appellant was "walked" to the front of his mobile home.
Once at the front of the mobile home, the agents told Appellant that they had reason to believe he was growing marijuana. They advised him of his Miranda rights, which he waived, and they asked for permission to search his residence and greenhouse. Appellant agreed and executed a written form that permitted the agents to conduct the search, which revealed the contraband and firearm. Appellant was charged with possession of a firearm by a convicted felon and several drug related counts.
The trial court concluded that the entry by officers onto the property was lawful because the greenhouse and surrounding field were not within the curtilage of the residence. Furthermore, the lower court concluded that Appellant's consent to search was freely and voluntarily given. As a result, the court denied Appellant's motion to suppress. Thereafter, Appellant entered a plea to the charges while preserving his right to appeal the dispositive issue of whether the evidence should have been suppressed.
On appeal, Appellant argues that the agents infringed upon his Fourth Amendment rights by crossing his fence, traversing his field and peering into the greenhouse. The State responds that these actions did not amount to a violation of the Fourth Amendment because the agents never penetrated the curtilage of *568 the residence.[1] We are constrained to agree with the State based on the Supreme Court's holding in United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).
In Dunn, DEA agents made three warrantless entries onto the defendant's 198-acre ranch on two consecutive days by crossing over a perimeter fence that completely surrounded the property. Thereafter they walked one-half mile, crossed several barbed wire fences, climbed a wooden fence and peered into the barn using flashlights to view the interior of the locked barn, at which time agents observed an illicit drug laboratory. The barn, which was 60 yards from the defendant's residence, was not visible from the perimeter of the property because the clearing in which the barn was situated was completely surrounded by woods. The Supreme Court concluded that these actions did not constitute a Fourth Amendment violation because the barn was not within the curtilage of the residence. Therefore, the defendant did not enjoy an expectation of privacy in the area immediately outside the barn.
In concluding as it did, the Dunn court announced a four-part test to use in determining whether an area is protected "curtilage." The Court emphasized, however, that the "centrally relevant consideration [in this determination is] whether the area in question is so intimately tied to the home itself that it should be placed under the home's `umbrella' of Fourth Amendment protection." Id. at 301, 107 S.Ct. 1134. Our application of the Dunn four-part test here, with emphasis on the "centrally relevant consideration," leads us to the inescapable conclusion that Appellant's greenhouse, like the barn in Dunn, does not lie within the curtilage of his residence.
The first Dunn factor, the distance between the home and the area claimed to be curtilage, is, in this case, unhelpful because the distance of 100 feet supports no inference either way. Likewise, the second Dunn factor, whether the area is included within an enclosure surrounding the home, is of little import here because the perimeter fence does not provide a demarcation point separating the residence and curtilage from the remaining property. See United States v. Taylor, 458 F.3d 1201 (11th Cir.2006) (holding perimeter fence around five-acre parcel did not bring entire parcel within curtilage of residence).
The third factor, however, suggests strongly that the greenhouse at issue *569 here did not fall within the protected curtilage. This factor requires that we analyze the use to which the area is put to determine if it was "so associated with the activities and privacies of domestic life" that it should be "deemed" a part of the residence. Dunn, 480 U.S. at 302, 107 S.Ct. 1134. Here, as in Dunn, the only use to which the structure was put was the manufacture of illicit drugs, a use completely disassociated with the "privacies of the home." This factor, therefore, militates in favor of the government.
The fourth and final Dunn factor involves an examination of the steps taken by Appellant to "protect the area from observation by people passing by." Id. at 301, 107 S.Ct. 1134. In Dunn, the barn was locked, enclosed within a wooden fence, barbed wire fence and a perimeter fence, yet the Court concluded that the defendant had done "little to protect the barn area from observation by those standing in the open fields." Id. at 303, 107 S.Ct. 1134. Here, the greenhouse was protected to a lesser degree than the barn in Dunn. It was not locked, it was constructed of semi-transparent material with a two-foot void, and only one fence, a standard rail fence, separated it from adjoining lands. Based on a comparison of the facts in Dunn, we must conclude that the fourth Dunn factor also favors the government.
The actions of the agents in approaching and peering into the greenhouse, therefore, did not infringe upon any protected constitutional right of Appellant because the area was outside the protected curtilage of the residence. Having reached this conclusion does not end our inquiry, however, because here, unlike Dunn, agents did not secure a search warrant before seizing the marijuana from the greenhouse and searching the residence.[2] Instead, they relied upon Appellant's consent to search. Appellant admitted that he gave written consent to search but testified that it was not voluntarily given because he was "scared" when he signed the consent form. The trial court rejected this claim, finding that the consent was voluntary. In reviewing this decision, our function is to determine whether this factual finding was clearly erroneous. State v. Breed, 917 So.2d 206, 209 (Fla. 5th DCA 2005); United States v. Van Shutters, 163 F.3d 331 (6th Cir.1998).
Below, the State had the burden to show that consent to search was voluntary by a preponderance of the evidence. Reynolds v. State, 592 So.2d 1082 (Fla. 1992).[3] This is a question of fact based upon the totality of the circumstances. Davis v. State, 594 So.2d 264 (Fla.1992). To conclude that a search is involuntary the court must find that the defendant's "will ha(d) been overborne and his capacity for self-determination critically impaired." United States v. Watson, 423 U.S. 411, *570 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). In making this determination, the courts have relied upon a variety of factors that address both the "characteristics of the accused and the details of the interrogation." Schneckloth, 412 U.S. at 226, 93 S.Ct. 2041.
The factors relevant here, which bear on the characteristics of the accused, include his age, whether he had a prior criminal historythe presumption being that one who has prior criminal arrests knows his legal rightsand whether there is evidence that he was intoxicated or suffering from a mental deficiency that impaired his ability to make an intelligent decision. Watson, 423 U.S. at 424, 96 S.Ct. 820; United States v. Bradley, 234 F.3d 363, 366 (8th Cir.2000).
As to the details of the interrogation, relevant factors considered by the courts include whether the defendant was advised of his Miranda rights, whether the defendant executed a written consent form, whether he was promised anything or threatened, the length of time police interrogated him before he consented, the location of the encounter and whether the defendant was in custody at the time he gave consent. Watson, 423 U.S. at 424, 96 S.Ct. 820; United States v. Navarro, 90 F.3d 1245, 1257 (7th Cir.1996); United States v. Kon Yu-Leung, 910 F.2d 33, 41 (2d Cir.1990); Taylor v. State, 855 So.2d 1, 17 (Fla.2003).
These factors should not be applied mechanically and no single factor is dispositive or controlling. United States v. Ponce, 8 F.3d 989, 997 (5th Cir.1993). Applying these factors here, we are unable to conclude that the trial court's determination was clearly erroneous.
The factors that relate to the characteristics of the accused all weigh in favor of the determination made by the trial judge. Appellant was, at the time, 37 years old. He was no newcomer to the law, having been previously convicted of at least one felony. There is no evidence that he was mentally deficient, intoxicated or incapable of making an intelligent decision.
As to the details of the interrogation, the majority of the factors favor the government's position. Appellant had been advised of his Miranda rights and agreed to talk to sheriff's agents without counsel present. He executed a written consent form. He was on his own property during daytime hours, not in a more coercive environment such as a police station or dark alley. The encounter was relatively short, and he was neither threatened nor promised anything to induce his consent.
Although he was not told he was under arrest or placed in handcuffs, we accept for the sake of argument that Appellant was in "custody." Furthermore, having been accosted at gunpoint by multiple officers, we do not doubt that Appellant's anxiety level was near its apex, especially given his knowledge that he had been caught red-handed. After sheriff's agents initially confronted Appellant, however, they led him to his front porch, permitted him to sit down, at which time they explained the reason for their presence, advised him of his rights and asked for his consent to search. At the hearing on Appellant's motion, when offered multiple opportunities to explain why he thought that his written consent was not voluntarily given, he offered only that he was "scared," testimony that the trial court was certainly free to reject. Even if true, we suspect that this reaction is common among those who endure the stress of an arrest. It by no means compels, as a legal conclusion, that Appellant's "will ha[d] *571 been overborne and his capacity for self-determination critically impaired," or that Appellant was "unable in the face of custodial arrest to exercise free choice." Watson, 423 U.S. at 424, 96 S.Ct. 820; see also Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041; United States v. Crespo, 834 F.2d 267, 271 (2d Cir.1987), cert. denied, 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988); United States v. Valencia, 645 F.2d 1158, 1165 (2d Cir.1980).
Although reasonable judges could differ when balancing the factors to be considered here, we are constrained to side with the trial judge unless we can say that his factual determination was clearly erroneous. Under this standard of review, we cannot so conclude.
AFFIRMED.
GRIFFIN, J., concurs.
MONACO, J., concurs and concurs specially with opinion.
MONACO, J., concurring.
While I fully concur in the well-reasoned opinion of the court in this case, I must say that I find it unnerving that despite the criminal trespass by state agents onto the land of the appellant, the search here is constitutional under the Fourth Amendment. Yet, that appears to be the state of the law as indicated in United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), and Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), and we are bound by that result. Frankly, however, I think Justice Marshall got it right in Oliver.
NOTES
[1] Although not argued by Appellant here or below, we note parenthetically that, at first blush, the fact that State agents apparently committed criminal trespass by entering fenced lands without consent presents a compelling argument for exclusion of the fruits of this unlawful intrusion. See § 810.09(1)(a)1., Fla. Stat. (2005) (providing entry upon fenced lands is first-degree misdemeanor). As Justice Marshall stated in Oliver v. United States, 466 U.S. 170, 191, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984):

[P]ositive law not only recognizes the legitimacy of [defendants'] insistence that strangers keep off their land, but subjects those who refuse to respect their wishes to the most severe of penaltiescriminal liability. Under these circumstances, it is hard to credit the [assertion of the majority] that [defendants'] expectations of privacy were not of a sort that society is prepared to recognize as reasonable.
This dissenting argument, however, failed to carry the day with the majority of our high court and apparently is not the law. See Sarantopoulos v. State, 629 So.2d 121, 123 (Fla.1993) (recognizing that majority of Oliver court implicitly rejected Marshall's argument). Although we do not condone police behavior that amounts to criminal trespass, it appears that exclusion of the evidence discovered as a result is not an available remedy to redress this wrongful conduct.
[2] Although a warrant was unnecessary to traverse the open field and peer into the greenhouse, under Dunn, in the absence of consent or other exigent circumstances, a warrant might have been required to enter the greenhouse and seize the plants. But see United States v. Pennington, 287 F.3d 739, 745-46 (8th Cir.2002) (citing Dunn for proposition that open fields doctrine does not authorize warrantless search of man-made structure within field, but nevertheless affirming warrantless search of bunker because unlocked and within field). Because we have determined that the seizure was preceded by Appellant's valid consent to search, we need not reach a conclusion on this issue.
[3] If the consent is preceded by an infringement of constitutional rights, such as an unlawful search or detention, the State has the burden to prove voluntary consent by clear and convincing evidence. Reynolds, 592 So.2d at 1085.